**CAROLINE GRISARD FEALOFA'I and MARCEL GRISARD, Trustee, Plaintiffs**

**v.**

**EUGENE REID and TUPU REID, Defendants**

High Court of American Samoa
Trial Division

CA No. 114-89

March 5, 1990

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiffs, Roy J.D. Hall Jr.
For Defendants, Afoafouvale L. Su'esu'e Lutu

This is an action for eviction. On March 20, 1985, plaintiff Caroline Fealofa'i and her late mother agreed to lease the defendants a parcel of land, along with the house that had been built upon it, for a term of ten to twenty years. (Although the lease speaks of Caroline Fealofa'i as the "lessor" and her mother Ruby Pritchard as the "landowner," the land actually belonged to a trust of which plaintiff Fealofa'i and her mother were the sole beneficiaries. Plaintiffs do not urge this as a ground for invalidity of the lease.)

At the time the lease agreement was made the construction of the house was not complete. The structure itself had been erected, but various important items including the windows, doors, floor covering, and interior ceiling remained to be installed. The lease agreement permitted defendants "to finish building the house and then credit the costs to the rent of the house and premises at an amount of $300.00 a month until the full amount is credited." The rental for the first ten years is $300 per month; defendants are given an option to renew for another ten years at $650 per month. Lessors further agreed to pay $1,000 "as an advance on rents."

Defendants began finishing the house almost immediately and completed the work in about three months. The improvements made by defendant were not limited, however, to items that can fairly be described as "building the house." Much of the work done was designed to facilitate the conversion of the house into a laundromat. In early July of 1985 the defendants opened Luisa's Laundromat on the leased premises.

Also in July of 1985, the lease was amended to give defendants an option to renew for an additional twenty years at the rate of $1,000 per month. This amendment was insisted upon by defendant in exchange for making a further advance on future rentals (apparently another $1,000) to plaintiff Fealofa'i.

Beginning in late 1985 or early 1986, plaintiff and her mother began asking defendant Eugene Reid when they would begin receiving

58

regular rental payments. Reid responded that the amounts to be credited --- cash advances plus the cost of improvements --- had not yet run out. On at least one occasion plaintiff and her mother demanded an accounting; defendant had his secretary give them a stack of receipts, which plaintiff says added up to $30,000 or $40,000. Defendant occasionally did give plaintiff Fealofa'i an additional "advance" on the rent; four "advances" --- at least some of which, on plaintiffs' view of the facts, should actually be regarded as partial payments of past due rent --- were made during 1986 and 1987 in a total amount of about $1,500.

Plaintiff Fealofa'i and her mother eventually consulted a lawyer. In June of 1988 he called defendant Eugene Reid and was referred to Mr. Reid's attorney. The record does not reflect what discussions, if any, the attorneys had, but on September 27, 1989, plaintiffs' attorney wrote to defendants demanding that they vacate the premises. On October 31, 1989, defendants' attorney responded that "[t]he amount of expenses in building the laundramat [sic] and cash advances comes out to a little over $21,000" and that defendants (who by then had been occupying the premises for about four years without paying rent) still had $8,000 in credits left to deduct before any rent would be due.

This lawsuit followed. Shortly before trial, defendants submitted an accounting in which they claim that their credits amount to $17,050.80, including about $14,000 in building expenses and about $3,000 advanced to plaintiff Fealofa'i. At trial defendants conceded that $944.72 of the claimed building expenses were necessary only to fit the house as a laundromat, not to finish building it, and were therefore not creditable against the rent. If, however, defendants' estimate of $16,106.08 in credits is correct, then no rent was due until January 1990, the fifty-fourth month after construction was completed.

Plaintiffs contend, however, that most of the claimed building expenses were not to "finish building the house" but to establish and operate a laundromat. They claim that only about $4,000 (including about $2,500 in advances) should be credited, and therefore that the rent is nearly four years overdue.

This lawsuit could probably have been avoided if the lease agreement were not so very uninformative. The one-page document (actually only about fourteen lines) fails to specify most of the terms generally included in a contract of lease. In particular, it purports to specify a rental amount but does not really do so. As the present controversy reveals, the figure of $300 per month minus credits is

illusory unless the amount of the credits is agreed upon or at least determinable by reference to the agreement. The document neither specifies what amount the Reids were to spend to "finish building the house" nor provides information from which a reasonable range might be determined. This omission, together with the vast disparity in the parties' statements of their respective understandings of this essential term, suggests strongly that the lease was too indefinite to constitute a legally binding contract.

If there were never a binding contract between the parties, each party would nevertheless be entitled to quantum meruit recovery for any benefits he or she conferred upon the other party in the belief that there was a contract. Mrs. Fealofa'i would be entitled to possession of her house and to its fair rental value for the time during which it has been occupied by the Reids, but only after compensating the Reids for improvements they made that are or will be of benefit to her.

Even on the assumption that there was a valid contract, however, the defendants' broad interpretation of their right to "finish building the house" at plaintiffs' expense exceeded even the ample limits within which reasonable people might disagree about the meaning of that vague term.[1] By claiming many more thousands of dollars' worth of expenses than they were even arguably entitled to under the lease, and refusing to pay the rent until such time as these expenses should all have been credited, they put themselves in breach of the contract by mid-1988 at the very latest.

In the first place, defendants' accounting includes $3,101.50 for improvement not of the house but of the surrounding land. Perhaps the only thing that emerges clearly from an examination of the lease agreement is a distinction between the "house" and the "house and premises." Defendants are to lease the whole "house and premises" but may deduct only such expenses as are necessary to "finish building the house." Even so, a reasonable person might construe "finish building the house" to include such improvements to the surrounding premises as were necessary to prevent the house from being inaccessible or otherwise uninhabitable. It is undisputed, however, that the house was accessible from the road before these improvements were made. They appear to have consisted primarily of a parking lot for the laundromat.

---

[1] This is particularly true in light of the rule that vague or ambiguous language should ordinarily be construed against the party who drafted it. The lease was drafted by defendants' then-attorney. Plaintiffs were unrepresented by counsel during the negotiations.

Similarly, certain other claimed expenses (beyond the $944.08 conceded by defendants at trial) appear to have been necessary not to finish building the house but to install a laundromat therein. For instance, defendants divide their expenses for plumbing materials as follows: $472.36 for such materials as were necessary to make the house suitable for general residential or business purposes, and only $25.97 for the specialized materials necessary to fit the house as a laundromat. Expenses for electrical materials are allocated $1,069.77 for general materials, $129.25 for laundromat materials. The Court's visual inspection of the house, however, revealed about thirty washing machines in all conceivable locations, all surrounded by pipes, wires, and fixtures that would be of no use anywhere but a laundromat, including at least one large pipe running above the floor through the center of the house. That pipe alone must have more than $25.97.

Moreover, the small amount allocated to establishment of the laundromat in defendants' accounting consists entirely of materials acquired at least two months *after* the laundromat had been open for business. The conclusion is inescapable that a substantial portion of the money spent on plumbing and electrical materials between April and early July of 1985, and also some of the lumber and miscellaneous hardware allocated to other categories in defendants' accounting, were expenses of the laundromat business and not fairly creditable against the rent. The total cost of materials now claimed by defendants (excluding materials for improving the land rather than the house) is $7,792.73. The most precise estimate we can make from the record before us and from visual inspection of the house/laundromat, giving the defendants the benefit of every conceivable doubt, is that the cost of laundromat-specific materials amounted to at least 10 per cent of the cost of all materials, or $779.27.

Even more disturbing are credits claimed by defendant for materials that appear not to have been used on the house at all. For instance, the 55 bags of cement purchased and credited in May and June of 1985 would appear to have been more than enough to do the cement work (a bathroom floor, steps at the three entrances to the house, and a top for a septic tank) which defendants' construction superintendent recalls. Defendants' accounting, however, includes an additional $757.35 for 150 bags of cement. Defendant Eugene Reid testified that the large expenditure on cement was justified because the house had a dirt floor when he acquired it and it was necessary to lay a concrete slab for the whole house. This was contrary to the testimony of plaintiff Fealofa'i and of defendants' own superintendent, who said that only the small

61

bathroom area needed a slab. The documentary evidence is also strongly against defendants' contention: although defendants' accounting dates the purchase of the 150 bags of cement on July 11, 1985, the invoice itself is dated July 11, 1986. This was over a year after the laundromat had opened for business and well after the completion of all cement work of which defendants produced any evidence.

Several other items purchased in 1986 or in late 1985 are included in defendants' accounting, all incorrectly listed as having been acquired in June or July of 1985: $522.48 for a large quantity of hack saw blades and rebars (allocated to a wooden partition that does not seem to have any hack saw blades or rebars in it); $13.45 for lumber; $47.92 for lumber and nails; $1.20 for indecipherable items; $69.75 for more indecipherable items.

Nor is it clear that all the materials acquired between April and June of 1985 were used on the house. Various invoices include a total of 25 gallons of paint costing about $250; the disputed house measures about 35' x 50' and consists almost entirely of one room; 25 gallons is a lot of paint; yet an invoice for $938.45 (incorrectly listed on defendant's accounting as $1,105.59) from a professional house painting company indicates that "we applied paint both interiorly and exteriorly" and includes $557.59 for "materials." At the rate defendants are seeking to credit paint against rent, that would be another fifty gallons. The house painters having supplied their own paint, we cannot conclude that another large quantity of paint was also used on the house from the bare fact that this other paint was acquired by defendants (who own other businesses besides the laundromat) at about the same time.

Finally, defendants' claimed labor costs of $1,873.40 are documented only by reference to the names of the persons who were paid and the dates on which they were paid. Since labor as well as materials were expended on fitting the house as a laundromat, improving the surrounding land, and other purposes extrinsic to "finish[ing] building the house," the claimed credit for labor must be reduced in the same proportion as the claimed credit for materials.

In conclusion, we find that the defendants are entitled to the following credits against rent:

*Materials*
Total amount claimed, April-July 1985
("Phase I" and "Phase II"): $10,894.23

62

Minus amount spent on land rather
than house: - 3,101.50
Minus estimated amount spent between
April and July 1985 to install
laundromat rather than to finish
building house: - 779.27
Minus other amounts that do not appear
to have been spent to finish building
the house: - 1,662.00

Credit for Materials: $5,350.66

*Labor*
Claimed credit for labor: $1,873.40
Credit for materials
allowed/claimed: x (5350.66/10,894.23)

Credit for labor: $920.11

*Amounts Paid to Plaintiffs*
Total Amount Claimed: $3,338.45
Minus 2/26/85 payment apparently
related to separate land
transaction: - 100.00
Minus amount claimed but
not documented or admitted: - 700.00
Plus amount not claimed or documented
but admitted by plaintiff: + 1,000.00

Credit for amounts paid: $3,538.45

*Total Credits*: $9,809.22

 

This credit is equal to the $300 monthly rental for 32 months
(July 1985 through February 1988) plus $209.22 toward the rental for the
next month (March 1988). Defendant owes $90.78 for March 1988 and
$300 for each additional month, for a total of $7,290.78 through March
31, 1990.

If it appeared that defendants' refusal to pay the rent during the
last two years was based in a reasonable interpretation of the lease

63

agreement and that defendants had stood ready at all times to make a full accounting to plaintiffs and to pay whatever rent should appear to be due, then equity would militate strongly against enforcement of the plaintiffs' legal right to repossess the premises upon defendants' breach. On the contrary, however, defendants attempted to charge plaintiffs for all sorts of expenses far removed in time, place, and purpose from the limited enterprise of "finish[ing]" to "build the house." Even if the defendants believed in good faith that the lease agreement allowed them to do this, such belief was not reasonable.[2] Indeed, the position taken by defendants in response to plaintiffs' early demands for rent would appear to have been even more difficult to sustain than the scaled-down accounting they submitted at trial. As late as October of 1989 defendants' then-attorney was insisting that the credits against rent amounted to over $21,000, a figure which was not itemized but which apparently included not only the cost of setting up the laundromat but also some of the ongoing expenses of running it.[3] Accordingly,

---

[2] We need not and do not find that defendants deliberately engaged in culpable behavior, but only that they breached the agreement (assuming it was definite enough to be susceptible of breach) and that the breach was not in reliance on a reasonable interpretation of the agreement. There may even be an innocent explanation for defendants' submission to the Court of invoices for items that appear not to have been used on the house; time has passed and memories may have faded. Reliance on such invoices as a justification for not paying the rent, however, must be regarded as unreasonable even if it was sincere.

[3] Defendants' position that they were entitled to credit for *all* improvements including those directly related to operation of the laundromat — a position from which they had receded somewhat by the time of trial, but which appears to have been at the heart of their refusal to pay any rent between 1985 and 1990 — was inconsistent not only with the most straightforward reading of the term "finish building the house" but also with the surrounding circumstances. This was not a short-term lease under which the landlord might expect to derive some eventual benefit from improvements made by the tenant for his own purposes. At the end of the forty years during which defendants were given the right to occupy the building, the value of most of the improvements — even those that were designed for general use rather than the tenant's own limited use — would have been negligible. Since the rental payments were the *only* benefit the landlord could expect to derive from the agreement, she had no reason to agree to an open-ended arrangement by which the defendants could avoid paying rent indefinitely simply by building themselves a better and better laundromat. Nor is $300 per month the sort of rent from which one would expect a landlord to allow extraordinary abatements.

These circumstances, together with the fact that defendants' attorney drafted the language over which the parties now disagree, would even support plaintiffs' position that defendants had the right only to credit a few really essential items such as doors and windows. Even such items as floor covering and the interior ceiling, which would presumably need replacement within forty years and would therefore be of no use to anyone but defendants, might plausibly be regarded as aspects of "interior decoration" rather than of "building the house."

judgment will be entered in favor of plaintiffs putting them in immediate possession of the house and premises. Judgment will further be entered in favor of plaintiffs in the amount of $7,290.78 for rent arrearages. This judgment will be stayed until March 31, 1990, or until the decision on any timely motion for reconsideration or new trial, whichever is later.

It is so ordered.

---

We have, however, given credit for all items shown to have been used in the house and not exclusively related to operation of the laundromat. The credits allowed include not only those for improvement of the interior, plumbing, wiring, and so forth --- or rather, for reasons discussed in the text, 90 per cent of the amounts claimed in these categories --- but also such items as the construction of a snack bar and the purchase of light bulbs for the fluorescent light fixtures. Whether or not such credits would have been appropriate if defendants had retained the building for forty years, they do seem appropriate insofar as plaintiffs are now in a position to derive some benefit from the items in question.